# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *ex rel.* [PARTY X] | ) | |
| | ) | |
| Plaintiff/Relator, | ) | |
| | ) | **SEALED COMPLAINT** |
| -v- | ) | |
| | ) | |
| [PARTY Y] | ) | |
| | ) | |
| Defendant. | ) | |

## FILED UNDER SEAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

OCT 0 3 2017

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* MARK HEATLEY | ) ) ) |
| **and** | ) ) |
| THE STATE OF GEORGIA *ex rel.* MARK HEATLEY | ) ) ) |
| Relator/Plaintiffs, | ) ) ) |
| -v- | ) ) |
| TURNING POINT CARE CENTER, LLC f/k/a TURNING POINT CARE CENTER, INC. | ) ) ) ) |
| **and** | ) ) |
| UNIVERSAL HEALTH SERVICES, INC. | ) ) ) |
| Defendants. | ) |

Case No. _____

(Judge _____)

**COMPLAINT AND JURY DEMAND**

# 1:17-CV-3869

**TO BE FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................ 1

II.    NATURE OF ACTION ......................................................... 5

III.    JURISDICTION AND VENUE ............................................. 5

IV.    THE PARTIES .................................................................... 6

V.    LEGAL FRAMEWORK ....................................................... 8

     A.    The Medicare Program ..................................................... 8

     B.    The Medicaid Program ...................................................... 9

     C.    The False Claims Act ....................................................... 11

     D.    The Anti-Kickback Statute ............................................... 12

     E.    The Anti-Inducement Statute ........................................... 14

     F.    Specific Types of Unlawful Inducements to Medicare
         Beneficiaries That Violate the Anti-Kickback Statute
         and Anti-Inducement Statute ........................................... 16

         a.    Free/Discounted Transportation Services ................. 16

         b.    Free/Discounted Lodging Arrangements ................... 18

VI.    FACTUAL ALLEGATIONS ................................................. 19

     A.    Turning Point Offers and Provides Free/Discounted
         Transportation Services in Order to Wrongfully Induce
         Medicare Beneficiaries to Enroll in Its Inpatient and/or

i

Outpatient Treatment Programs .................................................................... 22

B.    Turning Point Offers and Provides Free/Discounted
Lodging Arrangements at Fully-Furnished
Apartment/Houses to Its Medicare-Beneficiary Patients
in Order to Wrongfully Induce Them to Enroll in
Turning Point's Intensive Outpatient Program ................................ 25

COUNTS I–III (Violations of Federal False Claims Act) ................................ 34

COUNTS IV–VI (Violations of Georgia State Medicaid False Claims Act) ....... 36

PRAYER FOR RELIEF ............................................................................. 39

REQUEST FOR TRIAL BY JURY ................................................................ 40

CERTIFICATE OF SERVICE .................................................................... 42

## I.    __INTRODUCTION__

This is an action by *qui tam* Relator Mark Heatley ("Relator" or "Mr. Heatley"), through the undersigned counsel, made on behalf of the United States of America ("United States") and the State of Georgia against: (i) Turning Point Care Center, LLC f/k/a Turning Point Care Center, Inc. ("Turning Point"); and (ii) Universal Health Services, Inc. ("UHS") (collectively, "Defendants"), for using, making, presenting, causing, and continuing to use, make, present, or cause, false and fraudulent claims to be submitted to Medicare and Medicaid, in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1, *et seq.*

This case is about the fraudulent practices occurring at Turning Point—a UHS behavioral health facility located in Moultrie, Georgia.  Turning Point is one of UHS's most populated and profitable behavioral health facilities, providing substance abuse and rehabilitative treatment services to recovering addicts. Turning Point's fraudulent practices relate to both the inpatient and outpatient services it provides to its Medicare-beneficiary patients.   Relator is unaware whether the fraudulent practices are occurring elsewhere; Turning Point is considered unique and unlike UHS's other facilities.

The fraud alleged herein is straightforward—since at least 2011 (and upon information and belief, since as early as 2007), Turning Point has defrauded the government through a systematic pattern and practice of offering and providing illegal inducements to Medicare-beneficiary patients designed to improperly lure, entice, and incentivize patients to receive various inpatient and outpatient services at its treatment facility.  In addition and more specifically:

    (a)    Turning Point offers and provides free/discounted transportation services (*e.g.,* airfare, bus fare, etc.) in order to wrongfully induce Medicare beneficiaries (most of whom are out-of-state residents) to enroll in its inpatient and/or outpatient treatment programs; and

    (b)    After completion of the inpatient program, Turning Point—through a cash only, off-book, under-the-table, third-party bookkeeper—offers and provides free/discounted lodging arrangements at fully-furnished apartments/houses to its Medicare-beneficiary patients in order to wrongfully induce them to enroll in Turning Point's Intensive Outpatient Program ("IOP").

Federal law explicitly prohibits healthcare providers from offering free goods or services to induce Medicare beneficiaries to purchase, order, or receive goods or services payable by a federal healthcare program.  42 U.S.C. § 1320a-7b; 42 U.S.C. § 1320a-7a.  As a UHS facility, Turning Point is well-aware of this prohibition; indeed, UHS's own Code of Conduct provides:

> *Federal fraud and abuse laws prohibit offering or providing inducements to beneficiaries in government healthcare programs* and authorize the OIG to impose civil monetary penalties for these violations. . . . ***UHS personnel may not offer valuable items or services to these patients to attract their business*** (including gifts, gratuities, certain cost-sharing waivers, and other things of value). [1]

Despite this clear prohibition, Turning Point nevertheless knowingly and purposefully implemented the fraudulent practices alleged herein, designed to induce and exploit vulnerable, recovering addicts into receiving inpatient and outpatient services at Turning Point. In particular, Turning Point wrongfully recruited, lured, and induced Medicare patients from around the country to receive inpatient detox treatment at its facility in Moultrie, Georgia. After completion of the inpatient program, Turning Point further induced these patients to remain in Moultrie and receive intensive outpatient (IOP) services at its facility, rather than another program in the patients' home states. And as a result of the aforementioned illegal inducements, patients at Turning Point were incentivized to remain enrolled in the IOP longer than medically necessary, thereby receiving outpatient services that are no longer medically necessary. Moreover, upon information and belief, Defendants also routinely waived patients' copayments and

---

[1] UHS Code of Conduct, *available at* http://www.uhsinc.com/media/244570/uhs_ code-of-conduct.pdf (last visited October 2, 2017) (emphasis added).

3

deductibles to further induce receipt of inpatient and outpatient services and generate business payable by Medicare. Defendants then wrongfully billed Medicare for all inpatient and outpatient services provided to the illegally induced patients.

Mr. Heatley—Turning Point's current Associate Administrator responsible for overseeing the facility's ancillary operations—discovered the fraudulent practices shortly after he first began working at Turning Point in June 2017. Never in Mr. Heatley's 27 years in the industry has he seen a healthcare provider systematically offer inducements to lure and incentivize individuals to receive healthcare services at its facility. The fraud is so rampant—and Turning Point so unrepentant—that Mr. Heatley decided to file this *qui tam* action.

Almost all of Turning Point's patients (including nearly all of its 187 IOP patients) are Medicare beneficiaries—and over 90% of Turning Point's revenue comes from Medicare. In the 2017 fiscal year, Turning Point received on average over *$5 million a month from Medicare* for all services provided to its Medicare-beneficiary patients. Of that sum, Turning Point received from Medicare *over $2 million each month for inpatient services*, and *over $1 million each month for intensive outpatient (IOP) services*. The fraud continues today.

4

Under the terms of the False Claims Act, this Complaint is to be filed *in camera* and under seal and is to remain under seal for a period of at least sixty (60) days and shall not be served on Defendants until the Court so orders. The government may elect to intervene and proceed with the action within the sixty-day time frame, or within any extensions of that initial sixty-day period granted by the Court for good cause shown, after it receives both the Complaint and the Material Evidence submitted to it.

For his cause of action, Mr. Heatley alleges as follows:

## II.    NATURE OF THE ACTION

1.    This is an action to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733 and the Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1, *et seq.*

2.    Under the False Claims Act, a private person may bring an action in federal district court for himself and for the United States, and may share in any recovery. 31 U.S.C. § 3730(b). That private person is known as a "Relator" and the action that the Relator brings is called a *qui tam* action.

## III.    JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction to adjudicate this action under 28 U.S.C. §§ 1331 and 1345.

4.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact and have transacted business in this District.

5.     Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this District and Defendants transacted business in this District.   Defendants caused fraudulent claims to be submitted to Georgia's Medicaid program, which is located in this District.  In addition, several of Turning Point's patients are residents within this District and were induced to come to Moultrie, Georgia for inpatient and/or outpatient treatment services.

## IV.    **THE PARTIES**

6.     Mr. Heatley brings this action on behalf of the United States, including its agency, the Department of Health and Human Services ("HHS"), its component, the Centers for Medicare & Medicaid Services ("CMS," formerly the Health Care Financing Administration ("HCFA")), and all other government healthcare programs, such as Medicaid, TRICARE/CHAMPUS, Blue Cross/Blue Shield – CHIP, and Veterans Administration ("VA").

7.     Mr. Heatley also brings this action on behalf of the State of Georgia, including all state counterpart agencies to the federal agencies referenced above.

6

(For drafting convenience, all federal and state healthcare programs together, "Medicare").

8.      Mr. Heatley also brings this action on behalf of himself, as permitted under the False Claims Act. Mr. Heatley is a citizen of the United States and the State of North Carolina, currently residing in the State of Georgia. Mr. Heatley holds both a Master of Business Administration ("MBA") and a Master of Health Administration ("MHA"). Since June 2017, Mr. Heatley has worked at Turning Point as an Associate Administrator responsible for, among other things, overseeing the facility's ancillary operations and regulatory compliance. In his 27 years before that, Mr. Heatley held various directorial, managerial, and consultant positions at different healthcare facilities throughout the Southeastern United States. Mr. Heatley has direct and independent knowledge of the information on which the allegations set forth in this Complaint are based. Mr. Heatley is the original source of these allegations, and has knowledge of the false claims and records that Turning Point knowingly, falsely, and fraudulently submitted to the government as alleged herein.

9.      Defendant Turning Point Care Center, LLC f/k/a Turning Point Care Center, Inc. is a Georgia limited liability company with its principal office address located at 367 South Gulph Road, King of Prussia, Pennsylvania, 19406. Turning

Point's facility is located at 3015 Veterans Parkway South, Moultrie, Georgia 31788. Turning Point is directly managed and operated by UHS. Both Turning Point's Chief Executive Officer and Chief Financial Officer are UHS employees who control all of Turning Point's operations.

10. Defendant Universal Health Services, Inc. is a Delaware corporation with its principal office located at 367 South Gulph Road, P.O. Box 61558, King of Prussia, Pennsylvania, 19406. UHS is a national healthcare provider with approximately 293 behavioral health inpatient facilities and 24 outpatient facilities located throughout the United States, Puerto Rico, and the U.S. Virgin Islands. Turning Point is a UHS facility and part of UHS's nationwide network.

## V.    **LEGAL FRAMEWORK**

### A.    **The Medicare Program**

11. The Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program, was created in 1965 as part of the Social Security Act ("SSA") to pay the costs of certain healthcare services for eligible individuals. The Secretary of Health and Human Services ("HHS"), an agency of the United States whose activities, operations, and contracts are paid from federal funds, and who administers the Medicare program through the Health Care Financing Administration ("HCFA"), a component of HHS.

8

12.     Medicare is a 100% federally subsidized health insurance system for eligible Americans, including those aged 65 and older, certain disabled people, and certain people with chronic diseases who elect coverage.  42 U.S.C. § 1395c; *see* 42 U.S.C. §§ 1395j, 1395w.

13.     Under the terms and policies of insurance, Medicare only provides benefits for medically necessary services rendered by eligible and appropriately licensed providers.  *See* 42 U.S.C. § 1395y(a)(1)(A).  Medicare has no obligation to pay claims or provide benefits for unnecessary services.

14.     To participate in Medicare, a provider must sign and file a Provider Agreement with CMS promising compliance with applicable statutes, regulations, and guidance.  42 U.S.C. § 1395cc; 42 C.F.R. § 412.23(e)(1).  Medicare service providers have a legal duty to familiarize themselves with Medicare's reimbursement rules, including those delineated in the Medicare Manuals.  *Heckler v. Cmty. Health Serv. of Crawford Co., Inc.,* 467 U.S. 51, 64–65 (1984).

15.     Reimbursement for Medicare claims is made by the United States through HHS.  CMS is an agency of HHS and is directly responsible for the administration of the Medicare program.  CMS, in turn, contracts with private insurance carriers to administer and pay claims from the Medicare Trust Fund.  *See* 42 U.S.C. § 1395u.  Claims submitted for reimbursement are to be paid in

accordance with the Social Security Act, Code of Federal Regulations, and Medicare Rules and Regulations promulgated by CMS.

**B.    The Medicaid Program**

16.    Medicaid is a joint federal-state program that pays for healthcare services for low-income individuals, including pregnant women, children, and parents and other caretaker relatives, as well as elderly and disabled individuals. As a result of the Affordable Care Act, each state had the option to expand eligibility for Medicaid beginning in calendar year 2014 to all nonelderly adults with income below 138% of the federal poverty guidelines.

17.    Medicaid is jointly funded by state and federal governments. The federal government's share of each state's Medicaid spending, known as the Federal Medical Assistance Percentage ("FMAP"), is based upon the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Such share must be at least 50%, but no more than 83%, and historically has averaged about 57%. In other words, the federal government guarantees to match at least $1 in federal funds for every $1 any individual state spends on its Medicaid program.

18.    State Medicaid programs must comply with the minimum requirements set forth in the federal Medicaid statute to qualify for federal funding. 42 U.S.C. § 1396a. In order to receive reimbursement from Medicaid, a provider

must submit a signed claims form to the state's Medicaid program, certifying that the information on the form is "true, accurate, and complete." 42 C.F.R. § 455.18. The provider further certifies that it "understand[s] that payment of this claim will be from federal and state funds, and that any falsification, or concealment of a material fact, may be prosecuted under federal and state laws." *Id.*

19.     By participating in a state's Medicaid program, Defendants are charged with actual notice and knowledge of the federal and state statutes, regulations, and rules applicable to the Medicaid program, and have consented to compliance with all such statutes, regulations, and rules, including those governing reimbursement.

### C.     The False Claims Act

20.     The False Claims Act ("FCA") provides, in pertinent part, that any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
>
> . . .
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government,

11

> or knowingly conceals or knowingly and improperly
> avoids or decreases an obligation to pay or transmit
> money or property to the Government,
>
> is liable to the United States Government for a civil
> penalty of not less than $5,000 and not more than
> $10,000, . . . plus 3 times the amount of damages which
> the Government sustains because of the act of that
> person.

31 U.S.C. § 3729(a).  The Affordable Care Act requires a person who has received

an overpayment of Medicare or Medicaid to report and return the overpayment

within 60 days of identification or the date any corresponding cost report is due,

and failure to report and return the overpayment is an obligation for the purposes

of the False Claims Act under 31 U.S.C. § 3729(a)(1)(G).  *See* 42 U.S.C. § 1320a-

7k(d).

    21.   For purposes of the FCA:

> (1) the terms "knowing" and "knowingly"
>
> > (A) mean that a person, with respect to
> > information—(1) has actual knowledge of the
> > information; (2) acts in deliberate ignorance of the
> > truth or falsity of the information; or (3) acts in
> > reckless disregard of the truth or falsity of the
> > information; and
> >
> > (B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b).  Effective November 2, 2015 (the date of enactment of the

Federal Civil Penalties Inflation Adjustment Act, Improvements Act of 2015,

12

Public Law 114-74, sec. 701 ("2015 Amendments")), the penalties increased from a minimum-maximum per-claim penalty of $5,500 and $11,000 to $10,781 and $21,563. The increased amounts apply to civil penalties assessed for violations occurring after November 2, 2015. Violations that occurred on or before November 2, 2015 are subject to the previous penalty amounts. On February 3, 2017, pursuant to the 2015 Amendments annual re-indexing of the FCA penalties for inflation, the civil penalties again increased to the current minimum-maximum per-claim penalty of $10,957 and $21,916.

### D. The Anti-Kickback Statute

22. The Medicare and Medicaid Patient Protection Act a/k/a the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ("AKS"), was enacted to address Congress's concerns that remuneration to those in positions to influence healthcare decisions will cause corruption in the industry and may result in providers rendering goods and services excessively expensive and/or medically unnecessary.

23. The AKS prohibits, among other things, knowingly offering or providing remuneration for the purpose of inducing the recipient to receive a good or service for which payment may be made under a federal healthcare program. 42 U.S.C. § 1320a-7b(b).

13

24.    In particular, the AKS provides that:

> (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to induce such person—
>
> . . . .
>
> > (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal healthcare program,
>
> shall be guilty of a felony upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

*Id.* The AKS is violated if one purpose of the arrangement is to induce unlawful purchases, regardless if other legitimate purposes also exist.

25.    The AKS prohibits not only outright bribes, but *any and all forms of remuneration* by a healthcare provider to its patients for the purpose of inducing the patient. *See, e.g.,* HHS OIG Advisory Opinion No. 00-7 ("Remuneration from a [healthcare provider] to a patient that is intended to induce the patient to obtain [certain] services implicates the [A]nti-[K]ickback [S]tatute."). Unlawful remuneration under the AKS includes, among other things, "valuable gifts that are intended to induce patients to order services paid for in whole or in part by a federal healthcare program." *Id.*

14

26.     Pursuant to the ACA, a violation of the AKS constitutes a false or fraudulent claim for purposes of the False Claims Act.    Pub. L. 111-148, § 6402(f)(1), 124 Stat. 119 (2010), codified at 42 U.S.C. § 1320-7b(g) (noting that a claim "that includes items or services resulting from a violation of the [Anti-Kickback Statute] constitutes a false or fraudulent claim" for purposes of the False Claims Act).    Indeed, compliance with AKS is a precondition to participation in federally-funded healthcare programs and state Medicaid programs.    Payments for reimbursement under both Medicare and Medicaid are conditioned on compliance with, among other things, the AKS.

### E.      The Anti-Inducement Statute

27.     Similar to the AKS, the Anti-Inducement Statute (§1128A(a)(5) of the Social Security Act) ("AIS") explicitly prohibits, among other things, offering or providing remuneration for the purpose of influencing recipients to order or receive care from a particular provider, the payment of which may be made under Medicare.    42 U.S.C. § 1320a-7a(a)(5).    Also referred to as the "beneficiary inducement prohibition," this provision states:

> It is unlawful for any organization, or entity to "*offer . . . or transfer remuneration* to any individual eligible for [Medicare] benefits . . . that such [organization] *knows or should know is likely to influence such individual to order or receive from a particular provider*, practitioner,

> or supplier any item or service for which payment may
> be made."

*Id.* (emphasis added).   Violations may result in penalties of $10,000 per item or

service provided, treble damages, repayment of amounts paid, and exclusion from

federal programs. *Id.*

28.   The term "remuneration" is generally interpreted very broadly to

encompass anything of value including, without limitation, transfers of items or

services for free or for other than fair market value. *E.g.,* 42 U.S.C. §1320a-

7a(i)(6).

29.   An unlawful inducement may be either direct or indirect.  In a 2002

Special Advisory Bulletin, the Office of Inspector General stated:

> [E]ven if a provider does not directly advertise or
> promote the availability of a benefit to beneficiaries,
> there may be indirect marketing or promotional efforts to
> *informal channels of information dissemination, such as*
> *"word of mouth" promotion* by practitioners or patient
> support groups.

Office of Inspector General, *Special Advisory Bulletin: Offering Gifts and Other*

*Inducements to Beneficiaries* (August 2002) (emphasis added).  In addition, the

OIG stated that "the provision of *free goods or services to existing customers* who

have an ongoing relationship with a provider is *likely to influence those customers'*

*future purchases.*"  *Id.* (emphasis added).

16

30.     Compliance with the AIS is a precondition to participation in federally-funded healthcare programs and state Medicaid programs, and payments for reimbursement under both Medicare and Medicaid are conditioned upon compliance with, among other things, the AIS.

**F.      Specific Types of Unlawful Inducements to Medicare Beneficiaries That Violate the AKS and AIS**

31.     Under both the AKS and AIS, federal law prohibits healthcare providers from offering and providing free goods or services to induce Medicare beneficiaries to purchase, order, or receive goods or services payable by a federal healthcare program.  42 U.S.C. § 1320a-7b; 42 U.S.C. § 1320a-7a.  Examples of unlawful inducements include, but are not limited to, offering and providing free/discounted transportation services as well as free/discounted lodging arrangements.

**1.      Free/Discounted Transportation Services**

32.     The Office of Inspector General has determined that free/discounted transportation services implicate the AKS and AIS because they are likely to influence and induce a Medicare beneficiary's initial or subsequent choice to obtain services, as well as influence the beneficiary to choose one provider over another.  OIG Advisory Opinion No. 07-02; *see* HHS OIG Advisory Opinion No. 00-7 ("Healthcare providers that offer free goods or services, *such as free*

17

*transportation,* to federal healthcare beneficiaries may be subject to civil monetary penalties [under the Anti-Inducement Act]. . . . Moreover, *free transportation services* may implicate the criminal [A]nti-[K]ickback [S]tatute . . . .") (emphasis added). While federal law allows healthcare providers to provide free/discounted local transportation to new patients, the "transportation *cannot be used as a recruiting tool.*" 81 Fed. Reg. 88368, 88382 (Dec. 7, 2016) (emphasis added).

33.     The free/discounted transportation services need not be directly advertised or marketed to be unlawful; indirect "word of mouth" dissemination is sufficient.  Office of Inspector General, *Special Advisory Bulletin: Offering Gifts and Other Inducements to Beneficiaries* (August 2002); HHS OIG Advisory Opinion No. 07-02 ("The fact that the subsidized [transportation] services are not advertised directly to patients is not a meaningful safeguard; the availability of the reduced cost [transportation] services will be known to patients' physicians, who may serve as indirect channels of information dissemination.").

34.     Moreover, while a safe harbor exception exists under the AKS for certain free/discounted transportation services, certain conditions must be met for it to apply, such as: (a) the transportation cannot be for airfare or luxury travel; (b) the transportation must be limited to 25 miles (50 miles if the patient resides in a rural area); and (c) the transportation cannot be publicly marketed or advertised by

18

the healthcare provider.  42 C.F.R. § 1001.952(bb).

### 2.    Free/Discounted Lodging Arrangements

35.    The Office of Inspector General has also determined that free/discounted lodging implicates the AKS/AIS because it is likely to induce a Medicare beneficiary to select a certain healthcare provider over another. *See* HHS OIG Advisory Opinion No. 17-01 (stating that free/discounted lodging implicate the AKS/AIS, but a one to two night stay at a nearby hotel before/after surgery may fall under safe harbor).

36.    One specific area where this unlawful inducement frequently occurs is the drug rehabilitation industry.  In this context, healthcare providers offer addicts perks (*e.g.*, free/discounted lodging, gift cards, etc.) in exchange for attending a specific treatment center or enrolling in the provider's treatment program.  This practice is often referred to as "patient brokering."

37.    State lawmakers and law enforcement have taken affirmative steps towards combating such unlawful inducements.  For example, Florida has enacted a Patient Brokering Statute (which generally mirrors the AKS and AIS) in order to specifically address unlawful inducements.  The statute makes it unlawful for healthcare providers to offer or pay a benefit, bonus, rebate, kickback, or bribe, directly or indirectly, to induce patronage to a certain health facility.  Fla. Stat. §

19

817.505(1)(a).  As stated by the Florida State Attorney in a 2017 Task Force Report, "*[P]aying rent and amenities for patients in order to induce the patient to use a particular provider constitutes patient brokering.*"  Office of State Attorney, *Palm Beach County Sober Homes Task Force Report: Identification of Problems in the Substance Abuse Treatment and Recovery Residence Industries with Recommended Changes to Existing Laws and Regulations* (Jan. 1, 2017) (emphasis added).

*     *     *

38.     In sum, healthcare providers such as Turning Point are prohibited by federal law from offering and providing free/discounted services (*e.g.*, free/discounted transportation, lodging, etc.) to induce Medicare beneficiaries to receive healthcare services payable by a federal healthcare program.  42 U.S.C. § 1320a-7b; 42 U.S.C. § 1320a-7a.  Compliance with the AKS and AIS is a precondition to participation in federally-funded healthcare programs and state Medicaid programs, and payments for reimbursement under both Medicare and Medicaid are conditioned upon compliance with the AKS and AIS.

## VI.    <u>FACTUAL ALLEGATIONS</u>

39.     Since at least 2011 (and upon information and belief, since as early as 2007), Turning Point has defrauded the government through a systematic pattern

and practice of offering and providing illegal inducements to Medicare-beneficiary patients designed to improperly lure, entice, and incentivize patients to receive various inpatient and outpatient services at its treatment facility.

40.    In addition and more specifically:

      (a)    Turning Point offers and provides free/discounted transportation services (*e.g.,* airfare, bus fare, etc.) in order to wrongfully induce Medicare beneficiaries (most of whom are out-of-state residents) to enroll in its inpatient and/or outpatient treatment programs; and

      (b)    After completion of the inpatient program, Turning Point—through a cash only, off-book, under-the-table, third-party bookkeeper—offers and provides free/discounted lodging arrangements at fully-furnished apartments/houses to its Medicare-beneficiary patients in order to wrongfully induce them to enroll in Turning Point's Intensive Outpatient Program.

41.    Federal law explicitly prohibits healthcare providers from offering free goods or services to induce Medicare beneficiaries to purchase, order, or receive goods or services payable by a federal healthcare program. 42 U.S.C. § 1320a-7b; 42 U.S.C. § 1320a-7a. As a UHS facility, Turning Point is well-aware of this prohibition; indeed, UHS's own Code of Conduct provides:

> *Federal fraud and abuse laws prohibit offering or providing inducements to beneficiaries in government healthcare programs* and authorize the OIG to impose civil monetary penalties for these violations. . . . ***UHS personnel may not offer valuable items or services to***

21

> ___these patients to attract their business___ (including gifts,
> gratuities, certain cost-sharing waivers, and other things
> of value).

UHS Code of Conduct, *available at* http://www.uhsinc.com/media/244570/uhs_c

ode-of-conduct.pdf (last visited October 2, 2017) (emphasis added).

Despite this clear prohibition, Turning Point nevertheless knowingly and purposefully implemented the fraudulent practices alleged herein, designed to induce and exploit vulnerable, recovering addicts into receiving inpatient and outpatient services at Turning Point. In particular, Turning Point wrongfully recruited, lured, and induced Medicare patients from around the country to receive inpatient detox treatment at its facility in Moultrie, Georgia. After completion of the inpatient program, Turning Point further induced these patients to remain in Moultrie and receive intensive outpatient (IOP) services at its facility, rather than another program in the patients' home states. And as a result of the aforementioned illegal inducements, patients at Turning Point were incentivized to remain enrolled in the IOP longer than medically necessary, thereby receiving outpatient services that are no longer medically necessary. Moreover, upon information and belief, Defendants also routinely waived patients' copayments and deductibles to further induce receipt of inpatient and outpatient services and generate business payable by Medicare. Defendants then wrongfully billed

Medicare for all inpatient and outpatient services provided to the illegally induced patients.

42.     Mr. Heatley—Turning Point's current Associate Administrator responsible for overseeing the facility's ancillary operations—discovered the fraudulent practices shortly after he first began working at Turning Point in June 2017.  Never in Mr. Heatley's 27 years in the industry has he seen a healthcare provider systematically offer inducements to lure and incentivize individuals to receive healthcare services at its facility.  The fraud is so rampant—and Turning Point so unrepentant—that Mr. Heatley decided to file this *qui tam* action.

43.     Almost all of Turning Point's patients (including nearly all of its 187 IOP patients) are Medicare beneficiaries—and over 90% of Turning Point's revenue comes from Medicare.  In the 2017 fiscal year, Turning Point received on average over *$5 million a month from Medicare* for all services provided to its Medicare-beneficiary patients.  Of that sum, Turning Point received from Medicare *over $2 million each month for inpatient services*, and *over $1 million each month for intensive outpatient (IOP) services*.  The fraud continues today.

**A.   Turning   Point   Offers   and   Provides   Free/Discounted Transportation Services in Order to Wrongfully Induce Medicare Beneficiaries   to   Enroll   in   it's   Inpatient   and/or   Outpatient Treatment Programs**

44.    Turning Point has in place a fraudulent scheme designed to lure and entice individuals to come Moultrie, Georgia and receive inpatient/outpatient treatment services at its facility.   As a preliminary matter, while Turning Point is located in Moultrie, nearly all of its patients are from out-of-state, from places such as Michigan, Florida, Mississippi, and Tennessee, or from other parts of Georgia. Almost   none   are   local.     But   to   lure   these   patients   away   from   their   home towns/states and to ***travel several hundreds of miles*** to its own facility, Turning Point offers   free/discounted   transportation, including   ***airfare***, bus   passes, and personal van rides.   Upon information and belief, due to the rules on gifting and inducements, UHS and Turning Point discussed charging patients the actual transportation costs; however, this change has not been made.

45.    Turning Point offers the free/discounted transportation for the sole purpose of recruiting individuals to receive treatment services at its facility.   But for this free/discounted transportation, the patients would not come to Moultrie. Turning Point charges all patients a flat fee of $95 for their transportation, regardless of whether the patient is transported by airplane, bus, or van—with Turning Point paying the remaining difference itself.   The patients, however, never

actually pay the flat fee and instead receive the transportation (including airfare) for free. For example, Relator recalls one incident where two Turning Point employee's personally drove a patient from Moultrie to the New England area with absolutely no charge to the patient.

46.    Once in Moultrie, Turning Point provides its patients with free local transportation around Moultrie using its fleet of over ten vehicles, including several 15-passenger vans—driving patients to their apartments; to Turning Point's facility for treatment; to the grocery store; to the mall; and to anywhere else the patients may desire to go. The total distances for these services extends well-beyond the 25-mile safe harbor provision for local transportation. Turning Point provides this chauffer service for free to all its patients.

47.    As a part of his normal duties, Mr. Heatley reviewed and analyzed Turning Point's financial statements, including its balance sheets and income statements. A Turning Point income statement for periods ending June 30, 2017— titled, "PATIENT TRANSPORTATION"—specifically identifies Turning Point's actual and budgeted expenses for patient transportation under the line-item "Travel/Education." While ordinarily this line-item would be used to track expenses Turning Point incurs for its own employees' travel and education (*e.g.,* continuing healthcare education courses, travel and hotel for conferences, etc.),

Turning Point uses this item to track how much it spends on flying, bussing, and driving its patients several hundreds of miles to Moultrie. Based on the income statement, Turning Point spent $112,571.00 on patient transportation costs in June 2017 alone. And for the 2017 year-to-date, Turning Point had already spent over $630,000.00 on patient transportation.

48.    By offering and providing free/discounted transportation services, Turning Point violated the AKS and AIS because the services influenced and induced Medicare beneficiaries into choosing to receive inpatient and/or outpatient services at Turning Point rather than elsewhere. That the transportation involves airfare and distance greater than 25 miles renders the services outside the safe harbor exception. As a result, Turning Point's unlawful inducements tainted all inpatient and outpatient services it provided to its improperly induced patients. And by billing the government for the tainted inpatient/outpatient services, Turning Point submitted false and fraudulent claims to the government in violation of the False Claims Act.

26

**B.     Turning Point—Through a Cash Only, Off-Book, Under-the-Table, Third-Party Bookkeeper—Provides Free/Discounted Lodging Arrangements at Fully-Furnished Apartments/Houses to its Medicare-Beneficiary Patients in Order to Wrongfully Induce Them to Enroll in Turning Point's Intensive Outpatient Program**

49.     After Turning Point successfully recruits and lures—via its free/discounted transportation inducements—an out-of-state patient to Moultrie to receive inpatient treatment, the patient may then enroll in an intensive outpatient program ("IOP"). As part of the IOP, the patient continues to receive recovery-related tests and services 3–4 days per week. The patients have the option to enroll in any IOP they desire, whether in their home town/state or elsewhere.

50.     But to further induce and steer patients to remain in Moultrie and enroll in Turning Point's own IOP, Turning Point leases and offers patients the opportunity to live in fully-furnished apartments/houses in the Moultrie area while receiving IOP treatment services at its facility. All of Turning Point's 187 IOP patients reside at these leased residences. The patients regularly fail to pay the full monthly rent and utilities (with some patients paying nothing at all)—and Turning Point pays the landlords for its patients' monthly shortfall. For example, in July 2017 alone, Turning Point paid an additional $10,000.00 to cover its patients' unpaid rents/utilities. Turning Point purposely provides this free/discounted lodging arrangement in order to induce its patients to receive IOP services at its

27

facility. But for this free/discounted lodging, the patients would not remain in Moultrie.

51.    The leases are not in Turning Point's name, but are instead executed through a cash only, off-book, under-the-table, third-party "bookkeeper." Turning Point gives cash to the bookkeeper to execute the leases in her own name and make the monthly rental payments herself. The cash payments for rent are not identified in Turning Point's financials—Turning Point's lease program is done through a completely separate set of books and accounting records which are not available for Relator to view.

52.    In his normal duties, Relator met with the bookkeeper and recalls a specific conversation where she said how Turning Point's Former CEO explained that the facility cannot sign the leases itself because "there would be a conflict of interest." Upon information and belief, this purported "conflict of interest" is the federal prohibition against healthcare providers offering inducements to their patients. Turning Point's arrangement with the bookkeeper is merely an attempt to end-run this prohibition.

53.    The monthly rent for each property that Turning Point (through its bookkeeper) pays the landlords is well-above market value, given the condition and location of the apartments/houses. Lease periods last as long as three years,

28

but the average length of stay for each patient is approximately 6 months (with

some remaining for much longer). Examples of such leases include:

> (a)   A 36-month lease between the bookkeeper and the landlord, from May 1, 2016 to April 30, 2019, for the residential property located at 515 5th Avenue, Moultrie, Georgia 31768.   The monthly rent is $775.00;
>
> (b)   A 36-month lease between the bookkeeper and the landlord, from August 28, 2016 to August, 28, 2019, for the residential property located at 530 8th Street SE, Units A & B, Moultrie, Georgia 31768.   The monthly rent for is $1,855.00; and
>
> (c)   A 24-month lease between the bookkeeper and the landlord, from June 1, 2009 to May, 31 2011, for the residential property  located at 719 5th Avenue SE, Moultrie, Georgia 31765.   The monthly rent is $1,000.00.

54.    These apartments/houses are fully-furnished by Turning Point and

ready for a patient's immediate occupancy.  Such furnishings include, but are not

limited to, televisions, couches, sofas, tables, ottomans, recliners, chairs, beds, and

various kitchen compliances.  Turning Point also pays and maintains the utilities at

each leased premises, including the monthly payments for gas, water, electricity,

cable, and internet.  These utilities are not in the patients' names.

55.    Turning Point tracks the monthly rent and utilities owed for each

leased property.  In a spreadsheet titled, "MIOP [*i.e.*, Men's Intensive Outpatient

Program] Apartments," Turning Point lists the landlord's name, property address, number of units, number of beds per unit, and the monthly rent.  Examples include:

| Address | # of Beds | Rent Per Patient | Total Monthly Rent |
|---|---|---|---|
| 503 5th Ave. SE | 12 | $325.00 | $3,900.00 |
| 509 5th Ave. SE | 4 | $340.00 | $1,020.00 |
| 650 4th Ave. SE | 2 | $365.00 | $730.00 |
| 704 4th Ave. SE | 2 | $365.00 | $730.00 |
| 530 8th Street SE | 4 | $365.00 | $1,460.00 |
| 534 8th Street SE | 4 | $365.00 | $1,460.00 |
| 1010 West Blvd | 4 | $365.00 | $1,460.00 |
| 1012 West Blvd | 4 | $365.00 | $1,460.00 |
| 1016 West Blvd | 4 | $365.00 | $1,460.00 |
| 1028 West Blvd | 8 | $365.00 | $2,920.00 |
| 1032 West Blvd | 8 | $365.00 | $2,920.00 |

56.    While Turning Point sends a monthly bill for rent/utilities to the patients, this practice is *purely perfunctory*.  Turning Point makes no meaningful effort to collect the total amount of rent due, and will instead allow its patients to continue living at the apartments/houses for months without ever paying full rent

and utilities. And while the bookkeeper will cash a few patients' social security and/or disability checks, these funds are utterly insufficient to cover monthly rent. In another conversation Relator had with Turning Point's bookkeeper, the bookkeeper stated how in July 2017 alone, Turning Point personally paid her an additional $10,000 to cover the patients' unpaid rent and utilities. And upon information and belief, Turning Point also writes-off portions of this unpaid rent/utilities as "Medicare bad debt."

57.    In addition to not requiring its patients to pay rent/utilities, Turning Point also provides maintenance staff and additional funds for upkeep and repair work on the premises—*all at no charge to its patients*. The maintenance and repair fees are so high that, upon information and belief, Turning Point's CEO is currently seeking a full-time employee to help maintain the leased residences. Turning Point internally tracks these expenses for upkeep and repair work via a maintenance chart, which identifies the date of repair, the maintenance issue, and costs incurred by Turning Point. Based on this maintenance chart, from May 2015 to July 2017 alone, Turning Point paid nearly $13,000 for maintenance and repair costs at its apartments/houses. Examples include, but are not limited to:

> (a)    On May 20, 2015, Turning Point paid $1,200.00 to repair damage incurred from a grease fire at an apartment located at 708 4th Avenue SE;

31

(b)     On May 20, 2015, Turning Point paid $452.22 for a
        new A/C unit at an apartment located at 708 4th
        Avenue SE;

(c)     On June 11, 2016, Turning Point paid $167.00 for
        A/C repairs, fix the thermostat and unclog a drain at
        an apartment located at 713 5th Avenue;

(d)     On July 5, 2016, Turning Point paid $142.00 to
        replace a refrigerator door seal at an apartment located
        at 713 5th Avenue;

(e)     On September 27, 2016, Turning Point paid $45.00 to
        repair a leaking toilet at an apartment located at 650
        4th Avenue SE;

(f)     On October 18, 2016, Turning Point paid $91.00 to
        repair oven damage caused by a patient residing at an
        apartment located at 530 4th Avenue SE; and

(g)     On February 27, 2017, Turning Point paid $120.00 to
        repair a broken light and front door lock at an
        apartment located at 704 4th Avenue.

58.     Turning Point also pays for temporary lodging for its patients when

the leased apartment/houses become inhabitable.  For example, in August 2017,

when one of the leased residences needed to be fumigated, Turning Point paid

$2,520.00 for temporary housing elsewhere out of an escrow accounted funded by

Turning Point (above rental fee) and held by the landlord for apartment

repairs/upkeep.   The description on the check states, "tenant housing during

fumigation."

32

59.    As a result of this free/discounted lodging arrangement, Turning Point incentivizes these patients to enroll into its IOP, rather than another outpatient treatment program.   Relator recalls a specific comment made by a Director at Turning Point who stated that his staff is "doing their job to market and steer patients to [Turning Point's] IOP program."   In addition to this direct marketing and/or advertising, the free/discounted lodging arrangement is also indirectly promoted through various informal channels of information, including "word of mouth" communication amongst Turning Point's patients and employees.

60.    Once enrolled in the IOP, Turning Point's patients are perpetually induced to remain residing at the apartments/houses because they know that—unlike other residences—they will not be evicted by Turning Point for failure to pay rent/utilities.  In effect, the patients are provided with a free/discounted place to live—all they need to do is remain enrolled in and continue receiving services through Turning Point's IOP.  Consequently, many of Turning Point's IOP patients stay enrolled in the IOP for much longer than necessary purely to continue living under this arrangement.  And during this entire time, Turning Point continues to bill Medicare for all tests and services provided to its IOP patients, regardless of whether such tests are medically necessary.

61.    Turning Point knows that, compared to the cost of covering paying each patients' unpaid rent and utilities, it is more profitable to maintain a populous IOP census full of patients to whom it can provide outpatient treatment services and generate continued—albeit fraudulent—Medicare billings.   This is because Turning Point's lease program operates as a lucrative profit generator. As stated *supra*, Turning Point generates over $1 million a month from Medicare for its IOP patients alone—all of whom reside at these leased residences.

62.    By offering and providing free/discounted lodging, Turning Point violated the AKS and AIS because the lodging influenced and induced Medicare beneficiaries into choosing to receive IOP services at Turning Point rather than elsewhere.   By billing the government for the tainted IOP services, Turning Point submitted false and fraudulent claims to the government in violation of the False Claims Act.

63.    The fraudulent inducements will continue to worsen.  Turning Point is in the process of finalizing plans to build an outpatient building which will add 60 additional patient slots for $1.4 million.  Likewise, Relator was recently tasked to find additional residence that Turning Point can add to its lease program. Moreover, upon information and belief, Turning Point's Former CEO recently purchased nearby property with the intent to build apartments, which he will then

34

lease back to Turning Point's third-party bookkeeper for above-market rent prices, thereby allowing Turning Point to further increase its IOP patient census.

*     *     *

64.    In sum, through its systematic pattern and practice of offering and providing free/discounted transportation services and lodging arrangements, Turning Point knowingly and unlawfully induced its Medicare-beneficiary patients to receive various inpatient and outpatient tests and services, as well as caused patients to remain enrolled in Turning Point's IOP longer than medically necessary.    Upon information and belief, Defendants also routinely waived patients' copayments and deductibles in order to further induce receipt of services and generate business payable by Medicare.  Defendants then fraudulently billed Medicare for the numerous tests and services provided to the patients.

65.    By submitting Medicare claims, Defendants expressly, impliedly, and falsely certified that it was in compliance with all relevant and material statutory, regulatory, and contractual requirements. Defendants' misrepresentations were material to the government's payment decision—*i.e.*, had the government known that Defendants offered illegal inducements to its Medicare-beneficiary patients, the government would not have paid its claims.

35

66.     As a result of Defendants' fraudulent practices, the United States and the State of Georgia have suffered extensive damages.  In the 2017 fiscal year, Turning Point received on average over *$5 million a month from Medicare* for all services provided to its Medicare-beneficiary patients.  Of that sum, Turning Point received from Medicare *over $2 million each month for inpatient services*, and *over $1 million each month for intensive outpatient (IOP) services*.  Calculating these figures over a six year timeframe, the damages become considerably substantial.  The fraud continues today.

## COUNT I

### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A)

67.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

68.     As set forth above, from at least 2011 through the present (and upon information and belief, since as early as 2007), Defendants presented false or fraudulent claims for payment, or knowingly caused false or fraudulent claims for payment to be presented, to officials of the United States government in violation of 31 U.S.C. § 3729(a)(1)(A).

69.     By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the United States suffered actual damages and therefore

is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT II
### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(B)

70.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

71.    As set forth above, from at least 2011 through the present (and upon information and belief, since as early as 2007), Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

72.    By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT III
### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(G)

73.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

74.     As set forth above, from at least 2011 through the present (and upon information and belief, since as early as 2007), Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government pursuant to 31 U.S.C. § 3729(a)(1)(G).

75.     The Affordable Care Act requires a person who has received an overpayment of Medicare or Medicaid to report and return the overpayment within 60 days of identification or the date any corresponding cost report is due, and failure to report and return the overpayment is an obligation for the purposes of the False Claims Act under 31 U.S.C. § 3729(a)(1)(G). *See* 42 U.S.C. § 1320a-7k(d).

76.     By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendant, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT IV

### VIOLATION OF THE GEORGIA STATE
### FALSE MEDICAID CLAIMS ACT
### GA. CODE ANN. § 49-4-168.1(a)(1)

77.     Relator incorporates by reference the allegations set forth in the

38

foregoing paragraphs as though fully set forth herein.

78.     This is a claim for penalties and treble damages under the Georgia State False Medicaid Claims Act.

79.     As set forth above, from at least 2011 through the present (and upon information and belief, since as early as 2007), Defendants knowingly presented or caused to be presented to the State of Georgia false or fraudulent claims for payment or approval in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

80.     By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the State of Georgia suffered actual damages and therefore is entitled to multiple damages under the Georgia State False Medicaid Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT V

### VIOLATION OF THE GEORGIA STATE FALSE MEDICAID CLAIMS ACT
### GA. CODE ANN. § 49-4-168.1(a)(2)

81.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

82.     This is a claim for penalties and treble damages under the Georgia State False Medicaid Claims Act.

83.     As set forth above, from at least 2011 through the present (and upon

information and belief, since as early as 2007), Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim submitted to the State of Georgia in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

84.     By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the State of Georgia suffered actual damages and therefore is entitled to multiple damages under the Georgia State False Medicaid Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT VI

### VIOLATION OF THE GEORGIA STATE FALSE MEDICAID CLAIMS ACT
### GA. CODE ANN. § 49-4-168.1(a)(7)

85.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

86.     This is a claim for penalties and treble damages under the Georgia State Medicaid False Claims Act.

87.     As set forth above, from at least 2011 through the present (and upon information and belief, since as early as 2007), Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim submitted to the State of Georgia in violation of Ga. Code Ann. §

49-4-168.1(a)(7).

88.     By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the State of Georgia suffered actual damages and therefore is entitled to multiple damages under the Georgia State Medicaid False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## PRAYER FOR RELIEF

WHEREFORE, the United States and Relator demand that judgment be entered against Defendants and in favor of the Relator and the United States as follows:

On Count I through Count VI under the federal False Claims Act (and amended and equivalent state statutes), for the amount of the United States and State of Georgia's damages, multiplied by three as required by law, and such civil penalties as are permitted or required by law; the maximum share amount allowed pursuant to 31 U.S.C. § 3730(d) and applicable state laws; all costs and expenses of this action, including attorney fees, expenses and costs as permitted by 31 U.S.C. § 3730(d) and applicable state laws; and all such other relief as may be just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby

demands a trial by jury.

Dated: October _3rd_, 2017.

Respectfully submitted,

Laura K. Bonander
Georgia Bar No. 696541
WATSON BONANDER, LLC
2200 Century Parkway, NE
Suite 990
Atlanta, Georgia  30345
(404) 876-0049
lbonander@watsonbonander.com
(no facsimile number)

Gregory M. Utter*
Joseph M. Callow, Jr.*
Collin L. Ryan*
KEATING MUETHING &
KLEKAMP PLL
One East Fourth Street
Suite 1400
Cincinnati, Ohio 45202
Phone: (513) 579-6400
Fax: (513) 579-6457
gmutter@kmklaw.com
jcallow@kmklaw.com
cryan@kmklaw.com

42

Joel D. Hesch*
THE HESCH FIRM, LLC
3540 Ridgecroft Dr.
Lynchburg, Virginia  24503
Phone: (434) 229-8677
joel@howtoreportfraud.com

*Pro hac vice applications forthcoming*
*Attorneys for Relator, Mark Heatley*

## CERTIFICATE OF SERVICE

I hereby certify that on this _3rd_ day of October, 2017, a copy of the

Relator's Complaint was served on the following in accordance with Fed. R. Civ.

P. 4. A file-stamped copy of the Complaint's Cover Sheet will be served on the

following promptly after Relator's counsel receives such from the Clerk's office.


Hon. Jeff Sessions
Attorney General of the United States
950 Pennsylvania Avenue, Room 4400
Washington, D.C. 20530-0001

Hon. John A. Horn
United States Attorney for the Northern District of Georgia
United States Attorney's Office
Richard B. Federal Building
75 Ted Turner Drive, SW
Suite 600
Atlanta, GA 30303

Mr. Christopher Carr
Attorney General for the State of Georgia
40 Capital Square, SW
Atlanta, GA 30334


Laura K. Bonander